**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AZZINE KALI, | : | CIVIL ACTION |
|     **Plaintiff,** | : | |
| | : | |
|   v. | : | No.: 24-cv-4197 |
| | : | |
| ERASMO LOPEZ, et al., | : | |
|     **Defendants.** | : | |

**MEMORANDUM**

**SITARSKI, M.J.**                                          **March 5, 2026**

Presently pending before the Court is Defendants' Motion to Exclude Testimony and Opinions of Plaintiff's Expert John Dieckman (Mot. to Excl., ECF No. 44), Plaintiff's response in opposition (Resp., ECF No. 46), and Defendants' reply in further support (Reply, ECF No. 47). For the reasons that follow, the Court **GRANTS** Defendants' motion.

## I.      FACTUAL AND PROCEDURAL HISTORY

Plaintiff Azzine Kali alleges that while driving for Lyft on February 17, 2023, he was seriously injured in an automobile accident caused by the negligence of Defendant Erasmo Lopez, who at the time was operating his vehicle on behalf of Defendant J Bermudez Trucking, Inc. (Compl., ECF No. 1, at ¶¶ 7-12, 15-16). On July 1, 2024, Plaintiff filed suit in state court, and on August 14, 2024, Defendants removed the matter to this court. (Not. of Removal, ECF No. 1). They filed their answers to Plaintiff's complaint on August 22, 2024. (Answers, ECF Nos. 3 & 4).

On or about April 21, 2025, Plaintiff produced the report of vocational rehabilitation expert John Dieckman, an assistant vocational services director at Proto-Worx, Inc., and holder

of master's degrees in counseling and human services and divinity.  (Dieckman Dep., ECF No. 44-1, Ex. C, at 10-11).  In the report, he noted that Plaintiff's annual earnings from 2020 (when he began working as a rideshare driver for Lyft and Uber) through 2023 were: $17,096 (2020); $21,298 (2021); $19,617 (2022); and $20,014 (2023).[1]  (Dieckman Rpt., ECF No. 44-1, Ex. A, at 6).  Thus, Dieckman acknowledged that Plaintiff had no lost income for 2023, despite the accident having occurred in February of that year, but explained that Plaintiff's "pain increased in 2024 when he began to experience significantly less income is [sic: as a (?)] driver."  (*Id.*).  Dieckman initially stated in his report that Plaintiff provided him with six months of 2024 pay stubs showing gross income of $338, (*id.*), but upon being confronted at his deposition with an Uber tax summary for that year showing net income of $33,147, he agreed that Plaintiff had no lost earnings for 2024 either.  (Dieckman Dep., ECF No. 44-1, Ex. C, at 60).

Nonetheless, Dieckman calculated in his report that Plaintiff had past lost earnings of $26,008 based upon average annual earnings of $19,506 between 2019 and 2023 and the opinion of the independent medical examiner, Todd Chertow, M.D., that Plaintiff could work only approximately half of an eight-hour day.  (Dieckman Rpt., ECF No. 44-1, Ex. A, at 6).  However, Dieckman then concluded that these prior earnings were "not indicative of his actual earning capacity" "because they fluctuate considerably" and instead calculated his future annual earnings at 50 percent of the salary of a Philadelphia area passenger vehicle operator per the Bureau of Labor Statistics (BLS) ($36,980) projected over the 27.77 years remaining of Plaintiff's working life, for a total of $531,597 in lost future earnings (i.e., 0.5 x $36,980/ year x 27.77 years).  (*Id.* at 7).

---

[1]  Plaintiff also earned $8,060 in 2019 as a Dominoe's delivery driver.  (Dieckman Rpt., ECF No. 44-1, Ex. A, at 6).

On January 20, 2026, Defendants filed a motion to exclude Dieckman's report and testimony. (Mot. to Excl., ECF No. 44). Plaintiff responded on January 30, 2026, and on February 26, 2026 Defendants replied to Plaintiff's response. (Resp., ECF No. 46; Reply, ECF No. 47). This matter is now fully briefed and ripe for disposition.

## II.     LEGAL STANDARD

A district court has broad discretion in determining the admissibility of evidence. *See Walker v. Gordon*, 46 F. App'x 691, 694 (3d Cir. 2002). When faced with a proffer of expert testimony, the trial court must consider "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 579 U.S. 579, 592 (1993)). "These gatekeeping requirements have been extended to apply to all expert testimony." *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 147 (1999)).

The admissibility of expert opinion testimony is governed by Rule 702 of the Federal Rules of Evidence. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The Third Circuit has explained that Rule 702 embodies a "trilogy of restrictions" on the admissibility of expert testimony: (1) qualification; (2) reliability; and (3) fit. *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  The party offering the expert must prove each of these requirements by a preponderance of the evidence. *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999), *amended on other grounds by* 199 F.3d 158 (3d Cir. 2000).

## III.    DISCUSSION[2]

### A.    Reliability

In evaluating an expert's reasoning or methodology, a court should consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*De La Cruz v. V.I. Water & Power Auth.*, 597 F. App'x 83, 91 (3d Cir. 2014) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 745-46 (3d Cir. 2000)).  "[T]his list is non-exclusive and . . . each factor need not be applied in every case." *Elcock*, 233 F.3d at 746 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137).  When a court must evaluate an expert's use of "a non-scientific

---

[2] Although the parties spar briefly over Dieckman's qualifications, (Mot. to Excl., ECF No. 44, at 5; Resp., ECF No. 46, at 6), Defendants do not move to exclude his report and testimony because he is unqualified.  Accordingly, the Court does not address this requirement. Moreover, because Plaintiff agrees that Dieckman "could not reliably quantify Plaintiff's past wage loss," (Resp., ECF No. 46, at 6), the Court excludes that portion of his report and testimony without further comment.  (*See also* Reply, ECF No. 47, at 1-2 (pointing out Plaintiff's apparent concession on this point)).

method," it should consider these factors "where they are reasonable measures of the reliability of expert testimony." *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 152). The court's gatekeeping role requires that, where an expert "base[s] testimony upon professional studies or personal experience, [he or she] employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* (quoting *Kumho Tire Co.*, 562 U.S. at 152).

An expert's opinion need only have "good," not necessarily "perfect," grounds. *In re Paoli R.R. PCB Litig.*, 35 F.3d at 744. "Good grounds" may exist "for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they have been corrected, the scientist would have reached a different result." *Id.* A judge "will often still believe that hearing the expert's testimony and assessing its flaws was an important part of assessing what conclusion was correct and may certainly still believe that a jury attempting to reach an accurate result should consider the evidence." *Id.* at 745 (citing *In re Paoli R.R. PCB Litig.*, 916 F.2d at 857). In the end, "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence." *Id.* at 744 (quoting *In re Paoli R.R. PCB Litig.*, 916 F.2d at 857). The "ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's 'technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results.'" *Id.* (quoting *DeLuca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 956 (3d Cir. 1990)).

Nevertheless, the reliability restriction still prohibits "too great a gap between the data and the opinion proffered." *Oddi v. Ford Motor Co.*, 235 F.3d 136, 146 (3d Cir. 2000) (quoting *Gen Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Accordingly, the district court must

examine the expert's conclusions to ascertain "whether they could reliably flow from the facts known to the expert and the methodology he or she used." *Id.* (quoting *Gen. Elec. Co.*, 522 U.S. at 146).

Here, Defendants assert that Dieckman's opinion on Plaintiff's future lost earnings should be excluded because it is speculative, subjective and unsupported by any published or unpublished sources. (Mot. to Excl., ECF No. 44, at 11). They observe that he utilized no methodology in determining that Plaintiff would be permanently limited to part-time work but instead merely adopted Dr. Chertow's opinion on that point, which was itself based only on Plaintiff's own self-report. (*Id.*). Similarly, Defendants note that Dieckman used no methodology in substituting the BLS figure, which Plaintiff never actually reached, for his actual yearly earnings simply because they "fluctuated." (*Id.*). Defendants highlight that at his deposition Dieckman was unable to point to any literature or studies supporting this method of determining loss earnings for a rideshare driver. (*Id.* (citation omitted)). They thus conclude that Dieckman's decision to calculate Plaintiff's supposed lost earnings on the basis of those of a general "passenger vehicle operator," rather than his own earnings, was nothing more than Dieckman's own idiosyncratic choice without any underpinning in reliable methods or analysis. (*Id.*).

Plaintiff responds that Dieckman's oral revision of his report (regarding the absence of prior lost earnings) does not compel its wholesale exclusion. (Resp., ECF No. 46, at 8). Turning to the future lost earnings themselves, he declares that vocational experts like Dieckman "routinely" assess earning capacity based on BLS statistics, especially where a self-employed or gig-working plaintiff's income fluctuates yearly. (*Id.* ta 8-9). He disputes that it was improper for Dieckman to use the higher BLS earnings number simply because "Plaintiff never earned that

precise figure" and accuses Defendants in insisting otherwise of "misconstru[ing] the purpose of earning capacity analysis," which he claims looks to a plaintiff's earning potential going forward rather than just what he has earned in the past. (*Id.* at 9). He maintains that Defendants' disagreement with Dieckman's use of the BLS figure goes only to the weight of the opinion and should be addressed via cross-examination rather than exclusion. (*Id.*). Likewise, Plaintiff posits that Dieckman's reliance on Plaintiff's self-reporting and interview, at times translated by his wife, implicates only the report's probative value and does not render the opinion unreliable because these are accepted sources of information in the social science of vocational rehabilitation. (*Id.* at 8-9 (citing *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807 (3d Cir. 1997))).

Highlighting that Plaintiff cites no authority for his contention that vocational experts "routinely" employ BLS data, Defendants specify that in any event the issue here is that Dieckman did not apply a reliable methodology when he replaced Plaintiff's actual job earnings as a rideshare driver with the government figure even though at his deposition he was unable to identify any literature or studies supporting this decision and admitted that "[t]here's no particular way to confirm" that the selected BLS classification applies to Plaintiff. (Reply, ECF No. 47, at 2-3 (citing Dieckman Dep., ECF No. 44-1, Ex. C, at 56)). Defendants also distinguish *Kannankeril* on the basis that in that case the plaintiffs' expert explicitly accounted for all relevant causation explanations before settling upon the one proffered by them, whereas Dieckman merely accepted Plaintiff's representations "at face value." (*Id.* at 3-4 (citing 128 F.3d at 808-09)).

This Court agrees with Defendants that Dieckman's methodology in reaching his opinion regarding Plaintiff's future lost wages was unreliable. Although Plaintiff's earnings for his years

as a rideshare driver for which Dieckman had complete information at the time of his report (2020 to 2023) ranged within a reasonably narrow band of a few thousand dollars each year, Dieckman jettisoned this data based on actual income in favor of the much higher (approximately 73 percent more than Plaintiff's best year) BLS figure, despite the fact that he admittedly lacked key information regarding the applicability of the relevant BLS occupational classification, including what constituted "full-time" under it, the average number of days and hours worked, and whether the classification even covered rideshare drivers like Plaintiff. (Dieckman Dep., ECF No. 44-1, Ex. C, at 48, 56).  Tellingly, as Defendants highlight, at his deposition Dieckman could identify no literature or studies that support selecting the earnings figure from a BLS classification that may or may not apply to a plaintiff over his actual, multi-year, fairly consistent past earnings when projecting future lost income.  (*Id.* at 55).

Accordingly, applying the eight reliability factors noted above, it is apparent that Dieckman's novel methods have not "been subject to peer review," have an unknown "rate of error," are not "generally accepted," have an (at best) unproven "relationship . . . to methods which have been established to be reliable," and have not been set to "non-judicial uses."[3] *De La Cruz*, 597 F. App'x at 91; *see also In re TMI Litig.*, 193 F.3d at 663 (party offering expert has the burden of demonstrating that the relevant factors establish the admissibility of the evidence). Moreover, it is doubtful that Dieckman's hypothesized final calculation is "testable" as to accuracy given that his choice of the BLS figure reflects a lack of "the existence and maintenance of standards controlling the technique's operation . . . ." *Id.*  Thus, the lone factor

---

[3]  Notably, Plaintiff offers only blanket claims that experts in Dieckman's field "routinely" use such methods and that they are "well within the bounds of accepted vocational practice," (Resp., ECF No. 46, at 7-8), without identifying any supporting authority such as academic literature, industry publications or caselaw.

arguably counseling in favor of admitting evidence from Dieckman is that Defendants do not formally assail his qualifications to employ this methodology, such as it is. (Mot. to Excl., ECF No. 44, at 5 (arguing that Dieckman would be unqualified to give a medical opinion or one on liability but not asserting that he lacks the qualifications to look at *relevant* earnings figures and tabulate Plaintiff's anticipated losses based on them)).

For these reasons, the Court grants Defendants' motion to exclude Dieckman's report and testimony.[4]

**B.      "Fit"**

Although the unreliability of Dieckman's methods alone suffices to bar his report and testimony, the Court writes briefly to address the parties' remaining arguments regarding "fit," another requirement for admissibility. *Schneider*, 320 F.3d at 404. "The 'fit' requirement ensures that the evidence or testimony '[helps] the trier of fact to understand the evidence or to determine a fact in issue.'" *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 (3d Cir. 2017) (citing *In re TMI Litig.*, 193 F.3d at 663). "This condition goes primarily to relevance." *Id.* (quoting *In re TMI Litig.*, 193 F.3d at 663).

---

[4] In reaching this result, the Court agrees with Defendants that *Kannankeril* is inapposite to this case. Plaintiff seizes upon the fact that in *Kannankeril* our appellate court permitted a plaintiff's expert to testify where his methodology was based, in part, upon a review of her medical records rather than his own examination, extrapolating therefrom that "[t]he Third Circuit has expressly recognized than an expert's reliance on patient history and self-reported information does not render an opinion speculative or unreliable." (Resp., ECF No. 46, at 8 (citing 128 F.3d at 807)). But this uncontroversial point aside, the court repeatedly emphasized that the defendant may point to other alternative methodologies, thus requiring "the plaintiff's expert to offer a good explanation as to why his or her conclusion remains reliable." *Kannankeril*, 128 F.3d at 808. Because the defendant had offered none, the expert testimony was admitted. *See id.* ("The record in this case is devoid of any alternate diagnosis which [the expert] ignored or failed to consider.") Here, by contrast, Defendants observe that Dieckman could have used Plaintiff's *actual work and earnings history* instead of relying upon the potentially inapplicable BLS figure, and Dieckman (and Plaintiff) have not explained why his conclusion based on that much higher number remains trustworthy.

9

Defendants assert that Dieckman's opinion that Plaintiff is limited to 50 percent of a normal workload (and thus 50 percent of his earning capacity) does not fit the facts of this case because his post-injury 2023 and 2024 tax records show no diminution in his income.[5] (Mot. to Excl., ECF No. 44, at 12). Plaintiff responds that Defendants ignore the fact that Dieckman's opinion "directly addresses issues central to the jury's determination, including Plaintiff's post-injury vocational limitations and the economic impact of permanent partial disability." (Resp., ECF No. 46, at 10). He maintains that Defendants' disagreement with Dieckman's conclusions does not render them inadmissible. (*Id.*). In reply, Defendants largely reiterate the arguments advanced in their opening brief. (Reply, ECF No. 47, at 4-5).

This Court again agrees with Defendants. Dieckman's findings are predicated upon the notion that Plaintiff will permanently remain able to work only half of a full workload, with an attendant 50 percent cut in earnings. (Dieckman Rpt., ECF No. 44-1, Ex. A, at 7). However, after being injured in February 2023, Plaintiff went on to earn more as a rideshare driver that year than he did the year before and only $1,284 less than his all-time high from the year before that. (Dieckman Rpt., ECF No. 44-1, Ex. A, at 6). Indeed, in 2024 (the most recent year for which there appears to be earning information), Plaintiff earned approximately *69 percent more* than in 2022, the last full year before his injury. (*Id.*). Yet Plaintiff asks this Court to permit Dieckman to testify that Plaintiff will never again reach more than 50 percent of his former earning capacity.

---

[5] Likewise, they repeat their contentions that Dieckman improperly disregarded Plaintiff's actual, proven earnings from the years prior to his injury in favor of a figure from a generalized BLS occupational classification that may not even apply to Plaintiff and for which Dieckman certainly lacked key information. (Mot. to Excl., ECF No. 44, at 12). Because the Court already considered these arguments in terms of reliability, it does not address them further here.

Because such evidence would not "fit" the facts of this case, the Court will grant Defendants' motion to exclude it on this additional ground as well.

**IV.    CONCLUSION**

For the foregoing reasons, the Court grants Defendants' motion to exclude the report and testimony of Plaintiff's expert, John Dieckman.

BY THE COURT:

 /s/ Lynne A. Sitarski_____
LYNNE A. SITARSKI
United States Magistrate Judge